IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| JUDY CACCIOLA | : | CIVIL ACTION |
| | : | |
| v. | : | |
| | : | |
| WORK N GEAR | : | NO. 13-381 |

## MEMORANDUM

**Restrepo, J.**                                                                 **May 29, 2014**

      Judy Cacciola brought suit against her former employer, Work N Gear, for sexual harassment and retaliation in violation of federal and state law. Now before the Court is Work N Gear's motion for summary judgment on each of Cacciola's claims. For the reasons explained below, the motion will be granted.

## I.  FACTS AND PROCEDURAL HISTORY[1]

      In March of 2007, Cacciola began employment with Work N Gear, a retailer of clothing and footwear. *See* Joint Appendix ("JA") at 179. She started as a co-manager of Work N Gear's Glenolden, Pennsylvania retail outlet ("the Glenolden store"). *Id*. On May 4, 2008, Cacciola was promoted to manager of the Glenolden store. JA at 181. She continued as manager of that store until her termination on September 6, 2011. Def.'s St. of Facts ("SOF") ¶ 3.

### A.  Cacciola's Interactions with Michael Hollitt

      From approximately September of 2010 until the end of her employment, Cacciola's direct supervisor was a group manager named Michael Hollitt. *Id.* ¶ 5. Hollitt supervised Cacciola via telephone, from a Work N Gear store in New Jersey, where he also served as that store's manager. JA at 49. Hollitt's position afforded him substantial power over Cacciola. JA at 548. For example, Eileen Siner, Hollitt's own former supervisor, and a former regional manager

---

[1] All reasonable factual inferences are drawn in favor of Cacciola. *See Anderson v. Liberty Lobby, Inc*., 477 U.S. 242, 248 (1986).

for Work N Gear, testified that Hollitt could recommend the termination of employees such as Cacciola to Siner, and that together he and Siner would make a decision. *Id.* It is Hollitt who is alleged to have sexually harassed Cacciola.

Because Cacciola and Hollitt did not work in the same retail store, the vast majority of the alleged harassment occurred during telephone conversations. Cacciola does not allege that the substance of the conversations themselves were sexual in nature. Instead, she alleges that at the end of each phone call, rather than finishing the call by saying goodbye or some other normal sign-off, Hollitt would exclaim "happy canachi!," or, state that he was going to give Cacciola a "nipple twister." JA at 55-57. There was no rhyme or reason to which sign-off Hollitt would give, and the exclamations were completely unrelated to the conversations that preceded them. JA at 57.

Cacciola thought "happy canachi!" sounded like a nursery rhyme and did not consider it sexual in nature or harassing.[2] JA at 59. However, she alleges that upon hearing the "nipple-twister" sign-off she felt invaded; like Hollitt was "coming through the phone" and grabbing at her. JA at 58. The sign-off generally made it difficult for her to concentrate on her job for approximately forty-five minutes. JA at 59. Cacciola testified that she and Hollitt spoke one to three times per week, and he split his sign-offs between these two comments the entire time. JA at 110-111. Thus, according to Cacciola, he made the "nipple-twister" comment up to 100 times. *Id*. This alleged sign-off constitutes the vast majority of Hollitt's alleged sexual harassment.

Despite Hollitt's position as Cacciola's supervisor, they interacted in person only once, when the Glenolden store was rearranging its layout in late June or early July of 2011. JA at 189. Cacciola alleges that at that time Hollitt and another Work N Gear employee, Assistant Manager George Edelman, had a conversation that made Cacciola uncomfortable. JA at 61-64, 189-90.

---

[2]Hollitt was deposed in the case, but does not appear to have been asked about that phrase.

Specifically, with Cacciola standing between Hollitt and Edelman, Hollitt asked Edelman "[w]hen's the last time you had sex?" JA at 62. In turn, Edelman allegedly responded "[l]ast weekend, and I didn't have to pay for it." *Id*. Cacciola walked away from the conversation and didn't hear any other offensive remarks. JA at 63-64.

### B.  Cacciola Reports Hollitt's Conduct

Cacciola alleges that in June of 2011, approximately nine months after the telephone calls with Hollitt started, she began complaining about his conduct to Karen Berolini, Work N Gear's Massachusetts-based head of Human Resources. JA at 34. Cacciola states that in her initial call to Berolini she reported that Hollitt was saying "disgusting things," but did not specify what he was saying or that the disgusting things were sexual in nature. JA at 36. Cacciola did not ask Berolini to take any action, and alleges that Berolini said nothing in response; the conversation simply ended. JA at 37. She states the entire conversation was approximately three minutes long. *Id*. Cacciola alleges that she called Berolini again a few weeks later, and the first conversation was repeated verbatim. JA at 37-38.

The third time Cacciola alleges that she called Berolini was within one week of overhearing the exchange between Edelman and Hollitt. JA at 39-42. Cacciola alleges that in this call she described the Hollitt-Edelman conversation in detail for Berolini. JA at 39-40. Berolini herself allegedly suggested to Cacciola that the conversation constituted sexual harassment, and asked Cacciola if she wanted Berolini to "write it up." JA at 41. Cacciola replied "not yet," by which she meant that she did not want Berolini to begin sexual harassment procedures against Hollitt. *Id*. Cacciola stated that she and Berolini did not discuss any conduct beyond the overheard exchange. JA at 39-41.

At some point after the third phone call to Berolini, Hollitt allegedly placed a telephone call to Jennifer Webster, a former Work N Gear employee. JA at 219. Webster testified that during that call Hollitt seemed nervous, and asked Webster whether she had ever heard him make a sexual comment to Cacciola. *Id*. Hollitt also allegedly stated that Cacciola had told someone about the nipple-twister comments. *Id*. Next, Hollitt volunteered to Webster that Cacciola had been terminated from a previous job. *Id*. Finally, he told Webster not to tell Cacciola that he had called. *Id*.

Webster and Cacciola are next-door neighbors and Webster and Cacciola's daughter are close friends. JA at 199, 201. Accordingly, Webster quickly told Cacciola about the conversation with Hollitt. JA at 638. Cacciola alleges that soon thereafter she called Berolini again. JA at 44-45. In this call she informed Berolini that Hollitt had contacted Webster and another past employee about her. *Id*. She did not describe those conversations in detail or mention anything sexual in nature. *Id*. Around this same time, the phone calls between Cacciola and Hollitt allegedly ceased, with Hollitt calling Edelman, the Glenolden store's Assistant Manager, rather than Cacciola, when he needed to discuss Work N Gear matters. JA at 57, 66.

### C.  Events Preceding Cacciola's Termination

Each Work N Gear store maintained a list of employees who were to be called by Work N Gear's alarm company, in sequence, in the event of a tripped alarm. JA at 21-23, 249, 259, 521. At the Glenolden store, Cacciola, as group manager, was first on the list, followed by Edelman and "Keyholder" Denise Tramo, respectively. JA at 406-07.

During the late evening of August 26 and early morning of August 27, 2011, Hurricane Irene struck the Delaware Valley. As a result of power outages, the alarm at Work N Gear's Glenolden store was triggered by low battery readings. JA at 196, 293. Thus, Cacciola received a

call from the alarm company at approximately 4:05 AM. JA at 77. Work N Gear procedure –
especially during power outages that lead to drained batteries – is that store employees need not
immediately report to the store for this sort of notification. JA at 407. Accordingly, Cacciola
called the alarm company back, verified her password, and did not report to the store. JA at 78.

By 5:45 AM, however, the alarm began reporting other problems, including motion
detectors being tripped and glass being broken. JA at 78, 294-312. Cacciola received at least two
additional calls from the alarm company about these issues. *Id*. While Cacciola lives within two
miles of the Glenolden store, she told the alarm company that she could not go to the store at that
time, citing concerns about the weather. JA at 87, 293. Next, at approximately 8:50 AM, motion
detectors and glass-break detectors were triggered in the Glenolden store's stock room. JA at
309-10. Cacciola spoke again with the alarm company, told them that police were notified and
that she would not be going in. JA at 628.

Edelman received the same notifications as Cacciola. At the time he lived in Delaware,
which had instituted a driving ban, preventing him from going to the store.[3] JA at 481.
Accordingly, after the second alarm, he called Cacciola and told her that he could not respond.
JA at 82, 482. Cacciola alleges that she said nothing in return, except possibly goodbye.[4] JA at
82. Edelman in turn called Hollitt, informed him about the alarm, notified him that he could not

---

[3] Edelman and others testified that they saw on the news that Delaware had instituted such a ban.
Contemporaneous releases from the State of Delaware Governor's office confirm this to be the case. *See*
Press Releases, State of Delaware, Level 2 Driving Restrictions Instituted,
https://governor.delaware.gov/news/2011/1108august/20110827-Irene-Travel-Restriction.shtml
(announcing driving ban) and Governor Lifts Level 2 Driving Restrictions Level 1 Traffic Warning in
Effect, https://governor.delaware.gov/news/2011/1108august/20110828-Irene-Travel-Restriction-
Lifted.shtml (lifting driving ban) (accessed May 7, 2014).

[4] Many of Cacciola's alleged conversations, including two with Karen Berolini and this call with
Edelman are alleged to have one party call and inform someone of a fact, while the other party says
nothing in response, except to say goodbye and hang up the phone.

get to the store, and informed him that Cacciola was not going to the store either. JA at 483-84. Hollitt testified that he then made several calls to Cacciola to discuss the situation with her, including leaving at least one message, but she did not answer or return any of his calls.[5] JA at 523. Later that morning, Hollitt also called Frank Rossi, Work N Gear's Director of Loss Prevention. JA at 250.

Tramo, the third person on the list, was off from work at the time due to a medical condition. However, Edelman sent her a text message at approximately 7:30 AM and soon thereafter they had a telephone conversation regarding the alarm situation. JA at 362-63. After the call, Tramo called Cacciola. JA at 363-65. Cacciola does not recall the substance of the conversation, except that she recalls telling Tramo that she would "take care of [the alarm]." JA at 84-86. Tramo, on the other hand, testified that Cacciola informed her that Cacciola was going to ignore all calls from Hollitt, was not going into the store because she did not work on weekends, and that she did not care if the store burned down. JA at 363. Moreover, Tramo alleges that Cacciola told her – her subordinate – that she also should not go into the store and should also ignore attempts by Hollitt to contact her. *Id.*

Tramo then called Hollitt, and told him "exactly" what Cacciola told her. JA at 364. Tramo observed that the weather was no longer worrisome and offered to go the store herself. *Id.* Hollitt told her not to; that he would try to get ahold of Cacciola. *Id.* However, approximately two to three hours later, Hollitt called again, told Tramo that he could not get in touch with Cacciola and asked Tramo if she could go to the store to check it out. With the weather apparently now clear, she and her husband went to the Glenolden store at approximately 10:30 AM. *Id.* She inspected the store, observed a broken window, and reset an alarm before heading home. JA at 364-65. While there she informed Hollitt of the situation. JA at 364. Soon thereafter,

---

[5] Cacciola does not recall whether Hollitt called her on that day.

with the State of Delaware's driving ban lifted, Edelman was able to travel to the store, and by approximately 1:00 PM the Glenolden store was open. JA at 493.[6]

### D.  Work N Gear Investigation

Within a few days of the hurricane, Work N Gear began investigating what occurred at the Glenolden store. JA at 250. Hollitt spoke with Rossi and Berolini, JA at 251, 455, 527, and prepared a written statement dated August 31, 2011, which reiterated his version of the events. JA at 272. He also noted that when he spoke with Cacciola after the storm, and explained to her that Tramo reported to the store because Cacciola was not answering phone calls, Cacciola became "insubordinate and angry." *Id*. Rossi also spoke with Edelman and Tramo, who confirmed their version of events, including that Cacciola told Tramo that she would not go to the store because she did not work weekends, that she told Tramo not to go to the store and that Tramo should ignore calls from Hollitt. JA at 412-14. She also told Rossi that Cacciola was now very angry at her for going into the store, and giving her a hard time about being paid for an hour of her time on the day of the storm. JA at 366-68, 414. Tramo later provided a written statement that confirmed her version of events, including that Cacciola stated that she did not care if the store burned down. JA at 314-15.

On September 6, 2014 Rossi and Siner traveled to Glendolden to meet with Tramo and Cacciola in person. They did so with the authority from Berolini to terminate Cacciola after speaking with her. JA at 252, 459. Rossi and Siner first met with Tramo, where Tramo again confirmed her version of the events, including that Cacciola told her to ignore Hollitt, and that she stated that she didn't care if the store burned down. JA at 568-69. Next, Rossi and Siner met with Cacciola. Rossi alleges that upon speaking with her about the events of August 27, he found

---

[6] Edelman also testified that a few days later, on September 2, 2011, Cacciola told him during a shift change that he should no longer communicate with Hollitt about anything going on in the store. JA at 494

her to be untruthful, and in conflict with the testimony from the other employees. JA at 416. Siner testified that Cacciola stated that "she didn't care" about reporting to the store. JA at 567. Accordingly, Rossi informed Cacciola that she was terminated immediately. JA at 416.

Cacciola alleges that on the same day that she was terminated, at approximately 10:45 AM, she made another call to Karen Berolini, allegedly leaving a message that she wanted to pursue a harassment claim against Hollitt. JA at 147. There is no evidence that Berolini heard this message prior to Siner and Rossi's decision to terminate Cacciola, nor that the message was communicated to Rossi or Siner prior to Cacciola's termination.[7]

On September 7, 2011 Rossi sent an email to Berolini, summarizing the meetings with Tramo and Cacciola and the decision to terminate Cacciola. JA at 287.

### E.  Procedural History

On January 23, 2013, Cacciola filed this action, alleging sexual harassment/hostile work environment and retaliation in violation of Title VII and the Pennsylvania Human Relations Act (PHRA). On July 19, 2013, the case was transferred to my calendar from the Honorable Thomas N. O'Neil, Jr. On February 5, 2014, Work N Gear filed a motion for summary judgment. I heard argument on the motion on March 18, 2014, and received supplemental briefing from the parties on March 28, 2014.

## II.   LEGAL STANDARD

Summary judgment will be granted "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). A genuine issue exists if the evidence is such that a

---

[7] Rossi provided phone records demonstrating that he and Berolini spoke at 8:30 that morning, prior to his meetings with Tramo and Cacciola, and then not again until 4:11 PM, after Cacciola was informed that she was terminated. JA at 252-53.

reasonable jury could return a verdict for the non-moving party. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id*. at 248.

When deciding a motion for summary judgment, a court must draw all reasonable inferences in the light most favorable to the non-moving party. *Id*. at 255; *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005) (citations omitted); *see also Crawford v. Beard*, 2005 U.S. Dist. LEXIS 887, at *5 (E.D. Pa. Jan. 19, 2005) (citing *Big Apple BMW, Inc. v. BMW of N. Am., Inc*., 974 F.2d 1358, 1363 (3d Cir. 1992)). Thus, summary judgment is appropriate if, after reviewing the evidence and making all inferences in favor of the non-moving party, there is no genuine issue of material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).

## III.    ANALYSIS

### A.  Hostile Work Environment

Cacciola first claims that she was subject to a hostile work environment due to Hollitt's alleged sexual harassment. "Title VII prohibits sexual harassment that is 'sufficiently severe or pervasive to alter the conditions of [the plaintiff's] employment and create an abusive working environment.'" *Mandel v. M & Q Packaging Corp.*, 706 F.3d 157, 167 (3d Cir. 2013) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 67 (1986)). So, too, does the PHRA.[8] Thus, to succeed on her claim, Cacciola must establish that "(1) [she] suffered intentional discrimination because of [her] sex; (2) the discrimination was pervasive and regular; (3) the discrimination detrimentally affected [her]; (4) the discrimination would detrimentally affect a reasonable person of the same sex in that position; and (5) the existence of *respondeat superior* liability." *Huston v. Procter & Gamble Paper Prods. Corp.*, 568 F.3d 100, 104 (3d Cir. 2009) (citations

---

[8] "Pennsylvania courts generally interpret the PHRA in accord with its federal counterparts." *Rinehimer v. Cemcolift, Inc.*, 292 F.3d 375, 382 (3d Cir. 2002) (internal citation omitted). Accordingly, I will analyze these statutes together.

omitted). "The first four elements establish a hostile work environment, and the fifth element determines employer liability." *Mandel*, 706 F.3d at 167 (citing *Huston*, 568 F.3d at 104).

### i.  The First Four Elements of the Test

Work N Gear argues that there is no evidence which demonstrates that Hollitt discriminated against her on the basis of her sex. The Third Circuit has instructed that "not every sexual comment, action or joke creates a hostile work environment. That is, 'the mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability.'" *Brown-Baumbach v. B&B Auto., Inc.*, 437 F. App'x 129, 133 (3d Cir. 2011) (quoting *Weston v. Pennsylvania,* 251 F.3d 420, 428 (3d Cir. 2001)). However, to determine whether a hostile environment exists, a court should look at the allegations in total, rather than parsing out each individual incident of alleged harassment. *Id.* at 134 (internal citations omitted).

Here, Cacciola alleges that her supervisor repeatedly indicated that he was going to give her a "nipple twister." In such a circumstance, "the Third Circuit has noted that 'the intent to discriminate on the basis of sex in cases involving sexual propositions, innuendo, pornographic materials, or sexual derogatory language is implicit, and thus should be recognized as a matter of course.'" *Pattie v. AT&T*, No. 10-104, 2012 WL 1070031, at *6 (W.D. Pa. Mar. 29, 2012) (quoting *Andrews v. City of Philadelphia*, 895 F.2d 1469, 1482 n.3). A supervisor repeatedly informing his subordinate that he is going to batter her in a sexually explicit way is just such a situation. Accordingly, Cacciola has presented a triable issue on element one.

Cacciola has also presented a triable issue on element two, whether such discrimination was pervasive. "Harassment is pervasive when incidents of harassment occur either in concert or with regularity." *Andrews*, 895 F.2d at 1484 (internal quotations and citations omitted); *see also*

*Faragher v. City of Boca Raton*, 524 U.S. 775, 787, n.1 (1998) (holding that to qualify as pervasive, alleged conduct "must be more than episodic; [it] must be sufficiently continuous and concerted"). In her deposition, Cacciola stated that the harassment occurred regularly for up to a year.[9] At least two other witnesses, Webster, JA at 220, and Tramo, *Id.* at 358, testified that Cacciola had complained about harassment by Hollitt months before she was terminated, supporting an inference that the alleged sign-offs had actually occurred for some time.[10] Accordingly, when read in the light most favorable to Cacciola, the facts support a potential finding that Hollitt made repeated use of sign-offs indicating that he was going to give a "nipple twister" to Cacciola, such that his harassment was pervasive and regular. *See Jensen v. Potter*, 435 F.3d 444, 452 (3d Cir. 2006) (finding that the "significance" of "insults two to three times per week for 19 months . . . lies in their pounding regularity.").

Cacciola also creates a triable issue on the next element of her claim, that she was detrimentally affected by Hollitt's conduct. The Third Circuit has noted that the "inherently subjective question of whether particular conduct was unwelcome presents difficult problems of proof and turns on credibility determinations." *Mandel*, 706 F.3d at 169. Here, Cacciola testified that she repeatedly told Hollitt that his comments were disgusting, that she would slam down the phone, that upon hearing the "nipple-twister" sign-off she felt invaded, and that it felt like Hollitt was grabbing at her and "coming through the phone." JA at 47. She also testified that the sign-offs affected her ability to concentrate on her work for forty five minutes after each call. JA at

---

[9] I note that Cacciola's deposition testimony is inconsistent with her interrogatory answers and her charge of discrimination filed with the Pennsylvania Human Relations Commission. In her interrogatories she stated that the "nipple twister" comment occurred a *single time*, in June of 2011. JA at 185. In her charge of discrimination, she stated that the discrimination began three to four months prior to her termination, again pointing to approximately June of 2011. JA at 1.

[10] Tramo, a witness clearly hostile to Cacciola, also testified that Cacciola told her about the Hollitt-Edelman conversation. JA at 360.

59. Thus, read in light most favorable to her, the facts support a finding that the harassment detrimentally affected her.

Finally, Cacciola has also created a triable issue as to whether a reasonable person would have been affected by the alleged harassment. The Supreme Court has noted that this objective element of the test "ensures that 'ordinary socializing in the workplace,' 'teasing' and 'intersexual flirtation' is not mistaken as discrimination that affects the terms and conditions of one's employment." *Dreshman v. Henry Clay Villa*, 733 F. Supp. 2d 597, 615-16 (W.D. Pa. 2010) (quoting *Oncale v. Sundowner Offshore Servs., Inc.*, 523 U.S. 75, 81-2 (1998)). Here, reading all the evidence in the light most favorable to Cacciola, a jury could clearly find that a reasonable woman would be affected by Hollitt's alleged behavior towards Cacciola, his subordinate. Accordingly, Cacciola has satisfied the first four elements of the test.

### ii. *Respondeat Superior* Liability

The final element of the test, the existence of *respondeat superior* liability, is an area of much dispute between the parties. Cacciola argues that due to Hollitt's supervision of her, *respondeat superior* liability attaches. If it does, strict liability for his conduct exists to the extent that Work N Gear cannot avail itself of the *Faragher-Ellerth* affirmative defense, as discussed below. If, instead, Cacciola and Hollitt are merely coworkers, she may only succeed to the extent she can demonstrate that Work N Gear was "negligent or reckless in failing to train, discipline, fire or take remedial action upon notice of harassment." *Andreoli v. Gates*, 482 F.3d 641, 644 (3d Cir. 2007) (quoting *Bonenberger v. Plymouth Twp.,* 132 F.3d 20, 26 (3d Cir. 1997)). On balance, Cacciola has created a triable issue as to whether Hollitt was her supervisor.

In *Vance v. Ball State University*, 133 S. Ct. 2434 (2013), the Supreme Court recently clarified who qualifies as a supervisor in harassment actions, holding that

> an employer may be vicariously liable for an employee's unlawful harassment only when the employer has empowered that employee to take tangible employment actions against the victim, i.e., to effect a significant change in employment status, such as hiring, firing, failing to promote, reassignment with significantly different responsibilities, or a decision causing a significant change in benefits.

*Id.* at 2443 (internal quotations omitted). Given the holding of *Vance*, Work N Gear argues that Hollitt had "no authority to terminate Plaintiff's employment," because such authority "rested with Regional Managers such as Ms. Siner, or with certain home office personnel" in Massachusetts. Def.'s Mem. At 9. Even taking those assertions as true, I cannot agree that they absolve Work N Gear from strict liability as a matter of law.

In *Vance*, the Supreme Court specifically addressed the issue of whether employers could shield themselves from liability by removing a supervisor's final authority and concentrating that final power in a few individuals in a company, including those at a faraway location.

> [P]etitioner argues that tying supervisor status to the authority to take tangible employment actions will encourage employers to attempt to insulate themselves from liability for workplace harassment by empowering only a handful of individuals to take tangible employment actions. But a broad definition of "supervisor" is not necessary to guard against this concern. . . . [E]ven if an employer concentrates all decisionmaking authority in a few individuals, it likely will not isolate itself from heightened liability under *Faragher* and *Ellerth*. If an employer does attempt to confine decisionmaking power to a small number of individuals, those individuals will have a limited ability to exercise independent discretion when making decisions and will likely rely on other workers who actually interact with the affected employee. Under those circumstances, the employer may be held to have effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies.

133 S. Ct. at 2452 (*citing Rhodes v. Illinois Dept. of Transp.*, 359 F.3d 498, 509 (7th Cir. 2004) ("Although they did not have the power to take formal employment actions vis-à-vis [the victim], [the harassers] necessarily must have had substantial input into those decisions, as they would have been the people most familiar with her work—certainly more familiar with it than the off-site Department Administrative Services Manager").

13

The record here, when read in the light most favorable to Cacciola, presents strong similarities to the situation described by the Supreme Court. Cacciola directly reported to Hollitt, while Hollitt directly reported to Eileen Siner, Work N Gear's regional manager, who worked off-site. When asked about Hollitt's power over Cacciola, Siner stated that "[h]e did not have the authority *singly* to terminate. . . . he would not have the authority *alone*." JA at 548 (emphasis added). Instead, he could "recommend" her termination, in conjunction with Siner and Berolini (in Massachusetts). *Id*. This appears to be precisely the situation discussed in *Vance*, where Work N Gear "effectively delegated the power to take tangible employment actions to the employees on whose recommendations it relies." 133 S. Ct. at 2452; *see also Kramer v. Wasatch Cnty. Sheriff's Office*, 743 F.3d 726, 738 (10th Cir. 2014) ("A manager who works closely with his or her subordinates and who has the power to recommend or otherwise substantially influence tangible employment actions, and who can thus indirectly effectuate them, also qualifies as a 'supervisor' under Title VII.") (analyzing *Vance*). Accordingly, the record is adequate to support a finding that *respondeat superior* liability attaches such that Work N Gear is strictly liable for Hollitt's conduct. The next step in the analysis, however, Work N Gear's assertion of the *Faragher-Ellerth* affirmative defense, is where Cacciola's hostile work environment claim necessarily falls.

### iii.  *Faragher-Ellerth* **Affirmative Defense**

In two companion cases, the Supreme Court announced what has become known as the *Faragher-Ellerth* affirmative defense to claims of a hostile work environment:

> An employer is subject to vicarious liability to a victimized employee for an actionable hostile environment created by a supervisor with immediate (or successively higher) authority over the employee. When no tangible employment action is taken, a defending employer may raise an affirmative defense to liability or damages, subject to proof by a preponderance of the evidence.... The defense comprises two necessary elements: (a) that the employer exercised reasonable

14

> care to prevent and correct promptly any sexually harassing behavior, and (b) that the plaintiff employee unreasonably failed to take advantage of any preventive or corrective opportunities provided by the employer or to avoid harm otherwise.... No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment.

*Burlington Indus., Inc. v. Ellerth*, 524 U.S. 742, 765 (1998); *Faragher,* 524 U.S. at 807-08. In essence, "[t]he defense depends on the reasonableness of both the employer's and the plaintiff's preventative and remedial measures." *Cardenas v. Massey*, 269 F.3d 251, 266 (3d Cir. 2001). Additionally, "[t]hough not the only way to do so, an employer can establish its affirmative defense by showing that it 'promulgated an antiharassment policy with complaint procedure' and that the plaintiff employee failed to avail herself of the procedure." *Tate v. Main Line Hosps., Inc.*, No. 03-6081, 2005 WL 300068, at *21 (E.D. Pa. Feb. 8, 2005) (quoting *Ellerth*, 524 U.S. at 765).

At the outset, there is a threshold issue that neither party raised: Whether Cacciola's termination makes the affirmative defense inappropriate. *See Ellerth,* 524 U.S. at 765; *Faragher,* 524 U.S. at 807-08 ("No affirmative defense is available, however, when the supervisor's harassment culminates in a tangible employment action, such as discharge, demotion, or undesirable reassignment."). Regardless, the most sensible interpretation of the phrase "when the supervisor's harassment *culminates* in a tangible employment action," *id*., is that a plaintiff need show that "the tangible employment action was related to the alleged unlawful harassment or retaliation." *Seybert v. Int'l Grp., Inc*., No. 07-3333, 2009 WL 1971439, at *3 (E.D. Pa. July 6, 2009). As explained in the retaliation analysis, *infra*, it is clear that Cacciola was not terminated because of Hollitt's harassment. Accordingly, Work N Gear may attempt to avail itself of the defense.

### a. Work N Gear's Reasonableness

Even when reading the facts in a light most favorable to Cacciola, it is beyond dispute that Work N Gear acted reasonably.[11] Cacciola never actually described Hollitt's "disgusting" conduct to Work N Gear or complained that it was sexual harassment. In fact, only Cacciola's third phone call to Berolini could reasonably be seen as a report of sexual harassment. The harassment reported in that call – a two-sentence conversation that was overheard by, but not in any way directed at Cacciola – was not severe, and viewed in isolation would not rise to a Title VII violation. *See Weston*, 251 F.3d at 428 ("The mere utterance of an epithet, joke, or inappropriate taunt that may cause offense does not sufficiently affect the conditions of employment to implicate Title VII liability."). And, while a Court should not analyze individual allegations of harassment in isolation, Cacciola makes clear that this was the only actual comment that she reported. The "nipple-twister" sign-off, which Hollitt allegedly uttered anywhere from once to one-hundred times, was never mentioned to Berolini at all.

Moreover, when Cacciola reported the Hollitt-Edelman conversation, Berolini allegedly identified the conversation for Cacciola as potential sexual harassment and asked whether she wanted to start corrective procedures. JA at 41. Cacciola stated that she understood this to mean that Work N Gear would investigate and possibly discipline Hollitt. *Id*. Cacciola responded that she did not want to at that time. *Id*. Accordingly, given that the actual conduct that was reported to Work N Gear was not severe, that Work N Gear had adequate procedures in place, and that Work N Gear management itself identified the conduct as potentially being harassment, and then offered to start corrective procedures, Work N Gear acted reasonably. Thus, the *Faragher-*

---

[11] It is undisputed that Work N Gear had an extensive sexual harassment policy, and that Cacciola herself was responsible for training new employees on it.

*Ellerth* defense turns on whether Cacciola, a long-time store manager, unreasonably failed to avail herself of Work N Gear's remedial procedures.

### b.  Cacciola's Reasonableness

According to Cacciola, the sexually harassing conduct began in approximately September of 2010. Cacciola thus made no reports of any sort for approximately nine months. Such a delay, without sufficient explanation, is unreasonable. *See Newsome v. Admin. Office of the Courts of the State of New Jersey*, 51 F. App'x 76, 80 (3d Cir. 2002) (two-year delay without sufficient explanation was unreasonable as a matter of law) (citing *Gawley v. Indiana Univ.*, 276 F.3d 301, 312 (7th Cir. 2001) (affirming summary judgment for employer because failure to report harassment for seven months "constitute[d] an unreasonable failure to take advantage of the [employer's] corrective procedures.")). And, while Cacciola alleges that she did not report Hollitt for fear of retaliation, she presents no evidence that this fear was grounded in anything.[12] *Compare Newsome*, 51 F. App'x at 80 (no explanation for delay is unreasonable), *with Still v. Cummins Power Sys.*, No. 07-5235, 2009 WL 57021 (E.D. Pa. Jan. 8, 2009) (in *Faragher-Ellerth* analysis, the plaintiff testified that she witnessed other employees suffer retaliation, such that her own failure to complain was not unreasonable).

Additionally, once Cacciola did call Berolini, she first declined to describe what occurred. Then, during the third call, when Berolini allegedly identified the Hollitt-Edelman conversation as sexual harassment, Cacciola specifically asked Berolini not to take action. Such a failure, absent extenuating circumstances, is also unreasonable under the *Faragher-Ellerth* matrix. *Compare Werwinski v. Interstate Brands Corp.*, 08-5605, 2010 WL 3566738, at *8 (E.D. Pa. Sept. 14, 2010) (holding that a failure to avail oneself "of the defendant's

---

[12] In fact, Siner testified that Cacciola often made complaints to her, including about Hollitt, just not about sexual harassment. JA at 553-55.

preventive/remedial apparatus fits squarely into the scenario contemplated by the Supreme Court when it established the second prong of the *Faragher/Ellerth* defense"), *with Tate*, 2005 WL 300068 at *22 (employer who is put on notice that employee has potential complaint of hostile work environment, but neither initiates investigation, nor informs the employee it will not do so without a formal complaint, may not rely on *Faragher-Ellerth* defense). As with her nine month delay, Cacciola asserts that she told Berolini not to start procedures based upon her fear of retaliation. Again, she has failed to articulate any reason for this fear.[13]

In sum, because Work N Gear had an extensive sexual harassment policy, and because Cacciola unreasonably failed to take advantage of that policy, Work N Gear has established the *Faragher-Ellerth* affirmative defense, and Cacciola's harassment claim fails as a matter of law.

### B.  Retaliation

Title VII also protects employees who oppose conduct prohibited by that law. Thus, to proceed on her claim for retaliation, Cacciola must demonstrate "(1) that [she] was engaged in a protected employee activity; (2) that [she] was subject to adverse action by the employer either subsequent to or contemporaneous with the protected activity; and (3) that there is a causal connection between the protected activity and the adverse action." *Fasold v. Justice*, 409 F.3d 178, 188 (3d Cir. 2005) (internal citations omitted). Because Cacciola suffered an adverse employment action when she was terminated, she has clearly satisfied the second element of the prima facie case. The first and third element, engagement in protected activity and a causal link between that activity and her subsequent termination, require a more detailed analysis.

---

[13] Moreover, Work N Gear has, as part of its procedures, a way for employees to report harassment anonymously. JA at 262.

### i. Protected Activity

Cacciola's first two alleged "reports" – short phone conversations with Karen Berolini where she told Berolini that Hollit was saying "disgusting things," but did not specify what Hollitt was allegedly saying, nor in any way communicate that the conversation was sexual in nature – likely do not qualify as protected activity. As the Third Circuit has noted, "[o]nly complaints about discrimination prohibited by Title VII – that is, discrimination on the basis of race, color, religion, sex, or national origin . . . constitute protected activity." *Davis v. City of Newark*, 417 F. App'x 201, 203 (3d Cir. 2011). Moreover, an employee's intent in what she was conveying is irrelevant. Instead, "[i]t is the objective message conveyed, not the subjective intent of the person sending the message, that is determinative." *Curay-Cramer v. Ursuline Acad. of Wilmington, Delaware, Inc.*, 450 F.3d 130, 137 (3d Cir. 2006). Thus, general complaints that do not reasonably provide employers with knowledge of discrimination *because of a protected characteristic* do not qualify for retaliation protection. *See Barber v. CSX Distribution Servs.*, 68 F.3d 694, 702 (3d Cir. 1995) (complaint about being unfairly passed over for a job, which does not allege age discrimination, did not qualify as protected activity). Accordingly, Cacciola's first two alleged complaints to Berolini, which did not provide the basis for her allegations of "disgusting" comments, were likely not protected activity. Regardless, Cacciola's third and fourth calls, however, when considered in the light most favorable to her, constitute protected activity.

In Cacciola's third conversation, allegedly in early July of 2011, she described a short, sexually explicit exchange between Hollitt and Edelman. Berolini allegedly called the conversation "sexual harassment," and asked if Cacciola wanted to take action. Additionally, Cacciola testified that soon thereafter she called Berolini to report that Hollitt was, in essence,

retaliating against her. Read in the light most favorable to Cacciola, these final two exchanges reasonably constitute opposition to discrimination, and Cacciola has satisfied this element of the test.

### ii.  Causation between Cacciola's Protected Activity and Subsequent Termination

Cacciola must next demonstrate that there is a triable issue of whether there is a causal connection between her termination and her complaints to Berolini. One fact commonly offered to demonstrate causation is a close temporal proximity between the protected activity and the adverse action. *See, e.g., Jalil v. Avdel Corp.*, 873 F.2d 701, 708 (3d Cir. 1989) (finding that temporal proximity raised an inference of retaliation when adverse action occurred only two days after the protected activity). "While the passage of mere hours or days has been deemed unusually suggestive, courts have held that the passage of weeks, months, and years removes any suggestion of retaliatory motive." *Shenk v. Pennsylvania*, No. 11-1238, 2013 WL 1969311, at *8 (M.D. Pa. May 13, 2013). Cacciola's third and fourth conversations with Berolini occurred approximately two months prior to her termination. Such a gap is too long to qualify as unduly suggestive. *See Williams v. Philadelphia Hous. Auth. Police Dep't*, 380 F.3d 751, 759-60 (3d Cir. 2004) (finding two-month gap insufficient).

The absence of temporal proximity, however, is not fatal to Cacciola's claim. The Third Circuit has instructed that when "the time between the protected activity and adverse action is not so close as to be unusually suggestive . . . courts may look to the intervening period for demonstrative proof, such as actual antagonistic conduct or animus against the employee." *Marra v. Philadelphia Hous. Auth.*, 497 F.3d 286, 302 (3d Cir. 2007) Moreover, temporal proximity and antagonistic conduct "are not the exclusive ways to show causation, as the proffered evidence, looked at as a whole, may suffice to raise the inference." *Kachmar v.*

*SunGard Data Sys., Inc.*, 109 F.3d 173, 177 (3d Cir. 1997) (citation omitted). "Indeed, the Court of Appeals for the Third Circuit has set forth 'no limits' on the kinds of evidence that a court may consider when searching the record for the required causal link." *Nesmith v. Independence Blue Cross*, No. 02-2894, 2004 WL 253524, at *3 (E.D. Pa. Feb. 10, 2004) (quoting *Farrell v. Planters Lifesavers Co.,* 206 F.3d 271, 281 (3d Cir. 2000); *see also Wade v. Donahoe*, No. 11-3795, 2012 WL 3844380, at *7 (E.D. Pa. Sept. 4, 2012) (after passage of seven years since protected activity, still analyzing complaint for allegations of intervening antagonism); *Lee v. City of Philadelphia*, No. 13-510, 2014 WL 736185, at *4 (E.D. Pa. Feb. 26, 2014) (in nine-year intervening period, repeated, unexplained denials of promotions created plausible causal link). In sum, "[t]he element of causation is highly context specific, and requires looking at the record as a whole to determine whether the plaintiff has raised an 'inference that her protected activity was likely the reason for the adverse action.'" *Nesmith*, 2004 WL 253524 at *3 (quoting *Kachmar*, 109 F.3d at 177-78).

Cacciola provides evidence that in the months that followed her call to Berolini, she and Hollitt, her direct supervisor, stopped speaking altogether; that Hollitt called at least one former employee of Work N Gear, where he allegedly discussed Cacciola's allegations of sexual harassment; and that Hollitt volunteered to that former employee that Cacciola had been fired from a previous job. Such conduct, when read most favorably to Cacciola, demonstrates sufficiently antagonistic conduct in the intervening period between her protected activity and her termination. *See Marra*, 497 F.3d at 302. Accordingly, Cacciola has demonstrated a triable issue on the causal relationship between her protected activity and her termination, and has thus met her prima facie burden.[14]

---

[14] Cacciola's fifth "report" cannot meet the causation element of the test. Cacciola's testimony is that she left a message for Berolini at around 10:45 AM on the day that she was terminated. There is no

### iii.   Work N Gear's Proffered Reason for Cacciola's Termination

Because Cacciola has established a prima facie case of retaliation, "the burden of production shifts to [Work N Gear] to "articulate some legitimate, nondiscriminatory reason for the employee's rejection." *Fuentes v. Perskie*, 32 F.3d 759, 763 (3d Cir. 1994). Here, Work N Gear offers that Cacciola was fired for her failure to respond to the Glenolden store, her instruction to her subordinate not to go to the store or answer calls from Hollitt, apparent dishonesty in her meeting with Siner and Rossi, and her general insubordination. Thus, because Work N Gear has offered a nondiscriminatory reason for Cacciola's termination, "the burden of production rebounds to [Cacciola], who must now show by a preponderance of the evidence that [Work N Gear's] explanation is pretextual (thus meeting [Cacciola's] burden of persuasion)." *Fuentes*, 32 F.3d at 763.

### iv.   Cacciola's Allegations of Pretext

"To make a showing of pretext, '[Cacciola] must point to some evidence, direct or circumstantial, from which a factfinder could reasonably either (1) disbelieve the employer's articulated legitimate reasons; or (2) believe that an invidious discriminatory reason was more likely than not a motivating or determinative cause of the employer's action.'" *Burton v. Teleflex Inc.*, 707 F.3d 417, 427 (3d Cir. 2013) (quoting *Fuentes*, 32 F.3d at 764.). While not entirely

---

evidence that Siner and Rossi, who were making the decision to terminate her, had any knowledge of this. *See Omogbehin v. Dimensions Intern., Inc.*, No. 08-3939, 2009 WL 2222927, at *6 (D.N.J. July 22, 2009) ("[A] causal link cannot be established between a protected activity and an adverse action if the individual administering the adverse action is unaware of the protected activity."); *Bianco v. GMAC Mort. Corp.*, 2008 WL 5003023, at *7 (E.D. Pa. Nov. 25, 2008) ("Numerous courts have held that knowledge of the protected activity on the part of the decision-maker is a necessary prerequisite for a claim of retaliation.") (internal citations omitted). As noted above, Rossi provided his phone records, showing no calls between himself and Berolini during that time period, and nothing in the record suggests that Cacciola's call was heard by Siner or Rossi before they terminated her.

clear, Cacciola appears to argue that enough inconsistencies exist in Work N Gear's alleged reason for termination that a factfinder could find reasonably find it pretextual. I disagree.

Work N Gear's evidence of Cacciola's insubordination is exhaustive and includes:

- Testimony from Edelman, Hollitt and Tramo, who described their interactions, or lack thereof, with Cacciola on the day of the storm. This includes testimony from Tramo that Cacciola stated that she didn't care if the Glenolden store burned down, that Tramo should not answer calls from Hollitt and that Cacciola would not go to the store because she did not work weekends.

- Testimony from Tramo that Cacciola gave her a hard time because she reported to the store and spoke with Hollitt, and Rossi's confirmation that Tramo reported this to him.

- Contemporaneous reports from Work N Gear's alarm system.

- Detailed written statements produced by Hollitt, Tramo and Edelman consistent with their deposition testimony.

- Testimony from Siner, no longer employed with Work N Gear, that she found Cacciola to be dishonest in their meeting on the day that she was terminated.

- Testimony from Rossi detailing his investigation, and his belief that Cacciola was dishonest when he met with her.

Conversely, Cacciola's only supporting evidence for pretext is the same antagonistic behavior of Hollitt. However, nothing in the record suggests that Hollitt was behind Cacciola's termination. Instead, the record demonstrates that her termination resulted from an exhaustively detailed investigation of the events of August 27, 2011, as described above. Accordingly, a reasonable factfinder, when examining the record before the Court, could not find that Work N Gear's proffered reason for Cacciola's termination was pretextual. Thus, Cacciola's retaliation claim necessarily fails.

## IV. CONCLUSION

For the reasons stated above, Work N Gear's motion for summary judgment will be granted on each claim. An appropriate Order will follow.